COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Humphreys and Petty
Argued at Chesapeake, Virginia


OTIS SCOTT, III

v.        Record No. 0067-05-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
JULY 18, 2006


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Patricia L. West, Judge

Gregory B. Turpin for appellant.

Deana A. Malek, Assistant Attorney General (Robert F. McDonnell,
Attorney General, on brief), for appellee.


Otis Scott, III ("Scott") appeals his convictions of abduction with intent to extort money,

two counts of armed common law burglary, seven counts of robbery, nine counts of use of a

firearm in the commission of a felony, attempted extortion, and statutory burglary, in violation of

Code §§ 18.2-48, 18.2-90, 18.2-58, 18.2-53.1, 18.2-59, and 18.2-90, respectively.  Scott contends

the trial court erred in granting the Commonwealth's pretrial motion for joinder.[1]  Specifically,

Scott argues that the Commonwealth failed to prove that the offenses were part of a "common

scheme or plan" and, even if they were, that "justice still required separate trials."  For the

following reasons, we affirm the judgment of the trial court.

BACKGROUND

"On appeal, we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom."  Martin v. Commonwealth, 4

---

[1] Judge Stephen C. Mahan granted the Commonwealth's motion for joinder on January
14, 2004.

Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). So viewed, the evidence established the following.

On February 3, 2003, at approximately 10:30 p.m., a man approached Michelle Bingaman ("Bingaman") from behind as she was getting out of her car in front of her apartment building. The man pointed a gun at Bingaman's head and stated, "[w]e can do this the easy way or the hard way." The man told Bingaman to empty her pockets, and to lay down facing the ground. He then took her purse and fled on foot. Bingaman described the man as African-American, approximately six feet tall, medium build, and in his mid-twenties to thirties. During a photo lineup, and at trial, Bingaman positively identified Scott as the perpetrator of the crime.

On March 16, 2003, at approximately 10:40 p.m., a man approached Florentina Lizan ("Lizan") from behind as she was getting out of her car in front of her house. The man pointed a gun at her head, demanded money and credit cards, and threatened to kill Lizan if she did not cooperate. Lizan gave the man her wallet and her credit cards. After demanding the PIN number for her card, the man fled on foot to a car parked across the street. Lizan described the man as African-American, approximately five feet, nine inches tall, medium build, and in his mid-twenties or thirties. At a photo lineup, and at trial, she positively identified Scott as the perpetrator of the crime.

On March 23, 2003, shortly after 10:00 p.m., a man approached Kay Holloway ("Holloway") from behind as she was unloading her car in front of her house. The man had a gun on his side, and he demanded money, credit cards, and Holloway's ATM number. When Holloway did not move fast enough, the man raised the gun to his chest and pointed it at Holloway. Once Holloway gave him her money, the man fled on foot. Moments later, Holloway heard a car start up. Holloway identified the man as African-American, approximately

five feet, nine inches tall, medium build, and in his mid-twenties or thirties. However, she could not identify Scott at either a photo lineup, or at trial, as the perpetrator of the crime.

On April 27, 2003, between 10:00 and 10:30 p.m., a man approached Jeffrey Ratliff ("Ratliff") from behind as he was vacuuming out a van in front of a friend's home. The man placed a gun on the back of Ratliff's head, and he demanded Ratliff's wallet and the "code" for his credit cards. Ratliff gave the man his wallet, but told the man that he did not have any "codes" for his cards. The man then fled on foot. Ratliff identified the perpetrator as African-American, approximately five feet ten to five feet eleven inches tall, and about 180 pounds. He could not identify the perpetrator in a photo lineup. However, on the day of the trial, Ratliff identified Scott as his assailant.

On May 2, 2003, at 8:30 p.m., a man approached Holly Narducci ("Narducci") while she was alone in her garage. The man came up behind her from the driveway, pointed a gun at her, and said, "[s]cream and I'll kill you." The man demanded her wallet, stating that he wanted money and credit cards. He then asked for Narducci's PIN number, which she told him she did not have. Narducci then grabbed for the gun, a brief struggle ensued, and the man fled on foot. Narducci identified Scott as the perpetrator at both a photo lineup and at trial.

On May 13, 2003, at approximately 11:00 p.m., a man approached Jean Becker ("Becker") as she was getting out of her car in her driveway. When the man came up beside her car, Becker attempted to cross over to the other side of the vehicle in order to get away from him. However, the man grabbed her wrist and struggled with Becker in an attempt to get her wallet. In the course of the struggle, the man hit Becker with a hard object, chipping her tooth. The man took the wallet and fled. At trial, Becker identified Scott as the perpetrator of the crime.

On May 15, 2003, at approximately 12:30 a.m., a man approached Aderonke Aderonmu ("Aderonmu") as she was getting out of her car in front of her home. The man pointed a gun at

Aderonmu's head, and he demanded all of her money or else he would "blow her head off." Aderonmu panicked and dropped her purse. The man grabbed the purse, and he left in a car that was parked in front of a neighboring house. Aderonmu described the man as African-American with a medium build. She positively identified Scott in a photo lineup, and at trial, as her assailant.

On May 31, 2003, at approximately 9:30 p.m., a man approached Samuel Owens ("Owens") as he was working alone in his garage. The man ran up Owens' driveway, came into the garage, and pulled out a gun. When Owens began screaming, the assailant pointed the gun at Owens and told him to be quiet. The man demanded Owens' wallet. When Owens told him that his wallet was in the house, the assailant forced him to retrieve it at gunpoint. After demanding Owens' PIN number, the gunman fled on foot. Owens described the man as African-American, approximately five feet, seven inches tall, muscular, and in his mid-twenties. Owens identified Scott at both a photo lineup, and at trial, as the perpetrator of the crime.

On June 7, 2003, at around 10:00 p.m., a man approached Ian Goodwin ("Goodwin") as he was getting into his car in front of a friend's house. The man was holding a gun, and he demanded the keys to Goodwin's car. Goodwin said "no," and he began yelling for help. The man hit Goodwin several times in the head, and he then fled on foot. After the attack, Goodwin realized that his wallet was missing. Goodwin described his attacker as African-American, in his thirties, under six feet tall, and well built. Goodwin could not identify his attacker in a photo lineup, but at trial, Goodwin stated that Scott "positively resemble[d] the figure" he saw on the night he was attacked.

On June 14, 2003, a police officer stopped Scott for a traffic violation, and he was arrested for driving on a suspended license. After he was arrested, the police found a credit card

belonging to Goodwin in Scott's possession. They also found, in his car, clothing matching the descriptions given by Lizan and Narducci.

On September 2, 2003, a grand jury issued a twenty-seven-count indictment against Scott. On December 18, 2003, the Commonwealth moved for joinder, arguing that the multiple armed robberies had the following common scheme:

1. They occurred in the late evening;
2. Each of the victims were alone;
3. Each of the victims were threatened with a handgun;
4. The suspect demanded personal property from each victim;
5. The victims had either just arrived in their vehicle or were in their garage;
6. All of the robberies occurred in a residential neighborhood;
7. Most of the victims were either threatened or suffered bodily injury at the hands of the suspect;
8. Each robbery was committed by a lone suspect.

On January 14, 2004, after oral argument, the trial court granted the Commonwealth's motion for joinder. The trial court held that,

> [i]n weighing all of the various factors that we have considered . . . and in balancing all of the prejudice or the possible prejudice to the defendant and the other factors we've talked about, including the fact that several lay witnesses perhaps ostensibly might be required to testify in multiple separate trials if they were to be held separately, the standard by which that evidence is judged, the likelihood that at least some of those individuals may be in a position to be permitted to offer testimony as to identity in those cases in which identity would be an issue, the substantial similarities in terms of the modus operandi in these offenses, the method by which they were carried out, the similarity in the selection of victims, the type of victim, the location that was selected for the offenses, the offense itself that was committed, what was taken, what was requested in addition to the method and means by which the crimes were carried out, I think all of that suggest that the Commonwealth's motion should be granted . . . . I do not find that justice requires separate trials in this case.

On December 16, 2004, a jury convicted Scott of abduction with intent to extort money, two counts of armed common law burglary, seven counts of robbery, nine counts of use of a firearm in the commission of a felony, one count of attempted extortion, and one count of statutory

burglary, in violation of Code §§ 18.2-48, 18.2-90, 18.2-58, 18.2-53.1, 18.2-59, and 18.2-90. [2] On January 21, 2005, the trial court affirmed the findings of the jury, and sentenced Scott to 253 years incarceration. Scott now appeals.

ANALYSIS

"Rule 3A:10(c) permits the trial of multiple offenses committed by one defendant 'if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b).'" Traish v. Commonwealth, 36 Va. App. 114, 129, 549 S.E.2d 5, 12 (2001) (quoting Rule 3A:10(c)). Rule 3A:6(b), in turn, "permits the joinder of offenses 'if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan.'" Id. The determination of whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court, Yellardy v. Commonwealth, 38 Va. App. 19, 23-26, 561 S.E.2d 739, 742 (2002), and a trial court's ruling on the matter will not be reversed absent a showing that the court abused its discretion, Ferrell v. Commonwealth, 11 Va. App. 380, 386, 399 S.E.2d 614, 617 (1990).

### A. Whether the Offenses Were Connected or Constituted Parts of a Common Scheme or Plan

Rule 3A:6(b) provides three alternative ways to join multiple offenses into one trial. Specifically, "[o]ffenses may be joined if (1) the offenses are based on 'the same act or transaction,' (2) the offenses are based on 'two or more acts or transactions that are connected,' or (3) the offenses 'constitute parts of a common scheme or plan.'" Cook v. Commonwealth, 7 Va. App. 225, 228, 372 S.E.2d 780, 782 (1988) (quoting Rule 3A:6(b)). Here, the offenses were not "based on the same act or transaction." See Brown v. Commonwealth, 37 Va. App. 507, 514, 559 S.E.2d 415, 418 (2002) (noting that the alleged offenses "were not part of the 'same act

---

[2] Apparently, this case was being re-tried following an earlier mistrial.

or transaction'" because "[e]ach offense was a separate act taking place at a different location and at a different time"); see also Purvis v. Commonwealth, 31 Va. App. 298, 305, 522 S.E.2d 898, 901 (2000) (same). Accordingly, the controlling inquiry is whether the alleged offenses are "connected" or "constitute parts of a common scheme *or* plan." See Rule 3A:6(b) (emphasis added).

To determine whether the offenses were based on two or more acts or transactions that are "connected," the "crimes should be 'so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.'" Spence v. Commonwealth, 12 Va. App. 1040, 1044, 407 S.E.2d 916, 918 (1991) (quoting Kirkpatrick v. Commonwealth, 211 Va. 269, 273, 176 S.E.2d 802, 806 (1970)). In determining whether separate crimes are "connected" within the meaning of Rule 3A:6(b), the trial court should therefore consider whether the acts "were closely connected in time, place, and means of commission," Satcher v. Commonwealth, 244 Va. 220, 229, 421 S.E.2d 821, 827 (1992), as well as whether any evidence "link[s] or connect[s] one [offense] with the other," Spence, 12 Va. App. at 1044, 407 S.E.2d at 918.

A "common *plan*," in contrast, exists when the "'relationship among offenses . . . is dependent upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not attainable by the commission of any of the individual offenses.'" Godwin v. Commonwealth, 6 Va. App. 118, 122, 367 S.E.2d 520, 522 (1988) (quoting 2 ABA Standards for Criminal Justice § 13-1.2., at 13.9 (Supp. 1986) (commentary following § 13.1.2.) (omission in original)). In determining whether a common *plan* exists, the trial court should consider the "relationship among offenses," id., focusing upon whether the crimes, collectively, are motivated by a desire to attain a particular and identifiable goal. See id. ("A conspiracy involving more than one offense is a

typical example of offenses involving a common plan."); see also Webster's Third New International Dictionary 1729 (1993) (defining "plan" as "a proposed undertaking or goal").

On the other hand, separate offenses may be deemed part of a common *scheme* if their commonality of features, taken together, gives rise to a reasonable inference that each individual offense is attributable to the existence of an "artful plot"—for example, to repeatedly commit a particular type of crime. See Black's Law Dictionary 1346 (7th ed. 1999) (defining "scheme" as "[a]n artful plot," usually "to deceive others," such as "a scheme to defraud creditors"); id. at 269 (defining "common design," a designated synonym of "common scheme," as "[a]n intention to commit more than one crime"); see also Scates v. Commonwealth, 262 Va. 757, 762, 553 S.E.2d 756, 759 (2001) (holding that evidence of similar acts is admissible as proof of a common scheme "'where there is such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations'" (quoting McWhorter v. Commonwealth, 191 Va. 857, 870-71, 63 S.E.2d 20, 26 (1951)) (internal quotations omitted)). In determining whether two or more offenses are sufficiently related to constitute parts of a common scheme, the trial court should consider the common features between the offenses, such as whether the crimes have common types of victims, a common purpose, or a similar modus operandi. See, e.g., Traish, 36 Va. App. at 129-30, 549 S.E.2d at 12 (holding that the defendant's commission of several virtually identical crimes sufficed to prove a "common scheme" to "systematically bilk women drivers"); Kirk v. Commonwealth, 21 Va. App. 291, 296, 464 S.E.2d 162, 164 (1995) (finding that various robberies were part of a "common scheme" where the defendant "approached the same store, on foot, at the same time of night, and from the same direction," and "used the same handgun, made similar demands for money, and threatened the clerk not to follow upon exiting the store"); see also 18 U.S.C. Appx. § 1B1.3, cmt. 9A (noting that two or more offenses may be tried together

under the federal system if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi").[3]

In this case, the trial court never made an explicit finding as to which alternative in Rule 3A:6(b) led to the decision to grant the motion for joinder. Instead, the trial court made several findings of fact supporting the decision. Specifically, the court found that there were "substantial similarities in terms of the modus operandi," as well as in "the method by which they were carried out." It also found "similarit[ies] in the selection of victims, the type of victim, [and] the location that was selected for the offenses." Moreover, it found similarities in "the offense itself that was committed, what was taken, [and] what was requested." The Commonwealth contends that the "reasonable inferences" drawn from this evidence clearly support a finding that the crimes were related by virtue of a common scheme. We agree.

Scott chose to attack all nine of his victims during the late evening when they were alone by a vehicle or inside a garage. Scott used a handgun[4] each time he approached a victim, and

---

[3] To establish a "common scheme or plan," then, it is not always necessary to show that the defendant was motivated by a goal "not attainable by the commission of any of these individual offenses." Godwin, 6 Va. App. at 122, 367 S.E.2d at 522. Although Godwin has been subsequently cited as defining a "common plan *or* scheme," we note that the language of the opinion itself was limited to defining a "common *plan*." See id. In that sense, Godwin is distinguishable from Traish and Kirk, both of which focused, instead, upon whether the evidence sufficed to prove a common *scheme*. See Traish, 36 Va. App. at 129-30, 549 S.E.2d at 12; Kirk, 21 Va. App. at 296, 464 S.E.2d at 164. Thus, because the language of Rule 3A:6(b) is phrased disjunctively ("common scheme *or* plan"), these cases may be reconciled on the ground that Traish and Kirk dealt with the former, and Godwin, the latter. See generally Lewis v. Commonwealth, 267 Va. 302, 314-15, 593 S.E.2d 220, 227 (2004) ("'[T]he use of the disjunctive word "or," rather than the conjunctive "and," signifies the availability of alternative choices.'" (quoting Hedrick v. Commonwealth, 257 Va. 328, 339-40, 513 S.E.2d 634, 640 (1999) (internal quotations omitted))). And, because we find these cases to be reconcilable, we need not elect between the separate lines of precedent.

[4] Scott points out that the testimony regarding the type of gun used in each attack differs. Specifically, some victims testified that the gun was silver, while others testified that it was black. For purposes of determining whether there were enough similarities in the multiple

each time he threatened violence or actually struck the victim. In every instance, Scott demanded money and credits cards, and, in some cases, PIN numbers. In each instance, there was a lone victim and a single attacker. And, all of the attacks took place in residential areas located in the City of Virginia Beach.

Thus, although the crimes spanned a period of five months, the crimes were "closely connected in . . . place[] and means of commission." Satcher, 244 Va. at 229, 421 S.E.2d at 827; see also Yellardy, 38 Va. App. at 25, 561 S.E.2d at 742. As noted by the trial court, in addition to similar modus operandi, each crime also had a similar type of victim and occurred in a similar location. It follows that the trial court, considering this evidence, could have reasonably concluded that Scott formulated a general scheme to approach unprotected residents of Virginia Beach, while those individuals were standing just outside of their homes late at night, with a handgun and under threat of violence, and with the common purpose of obtaining the victims' credit cards, money, and PIN numbers. Cf. Ferrell, 11 Va. App. at 391, 399 S.E.2d at 620 (holding that the defendant's "similar and continuing acts" of breaking and entering into various automobile dealerships, all located in the City of Chesapeake, constituted a common scheme or plan even though the crimes occurred over a span of approximately six weeks). Because the trial court could reasonably have concluded that the common features of the separate crimes sufficed to prove that they were the individual manifestations of some overriding criminal scheme, we hold that the trial court did not abuse its discretion in concluding that the crimes, by virtue of their striking factual similarities, satisfied the requirements of Rule 3A:6(b). See Satcher, 244

---

crimes to support the trial judge's decision to join the cases, we see these distinctions as immaterial.

Va. at 230-21, 421 S.E.2d at 827-28; Yellardy, 38 Va. App. at 25-26, 561 S.E.2d at 742-43;

Traish, 36 Va. App. at 129-30, 549 S.E.2d at 12; Kirk, 21 Va. App. at 296, 464 S.E.2d at 164.

## B. Whether Justice Required Separate Trials

Although the offenses were "part of a common scheme or plan" under Rule 3A:6(b), we

must also determine if justice required Scott to have separate trials. See Rule 3A:10(c). Scott

objected to the motion for joinder, arguing that there will be obvious prejudice to him by joining,

into one trial, victims who can identify Scott as the attacker, with those who cannot.[5] We

disagree.

Justice typically "requires separate trials where the evidence of one of the crimes is not

admissible in the trial of the other." Godwin, 6 Va. App. at 123, 367 S.E.2d at 522. Thus, when

determining whether justice permits separate offenses to be tried simultaneously, the primary

inquiry is whether evidence of the other criminal conduct would be admissible, during the trial of

each individual offense, under one of the exceptions to the rule prohibiting the introduction of

"other crimes" evidence. See generally Kirkpatrick, 211 Va. at 272, 176 S.E.2d at 805.

As pertinent here, evidence of "other crimes" is relevant and admissible to prove "the

perpetrator's identity," as long as "'some aspects of the [other criminal conduct] are so

distinctive or idiosyncratic that the fact finder reasonably could infer that the same person

committed both crimes.'" Shifflett v. Commonwealth, 29 Va. App. 521, 529, 513 S.E.2d 440,

444 (1999) (quoting Guill v. Commonwealth, 255 Va. 134, 138-39, 495 S.E.2d 489, 491 (1998)).

Thus, justice does not generally require separate trials when evidence of the other offenses would

---

[5] On brief, the Commonwealth concedes that Scott made this argument at the motion hearing. However, the Commonwealth argues that, because Scott did not make this argument again at trial, Rule 5A:18 bars its consideration on appeal. To the contrary, because the trial court's ruling on the motion for joinder — the same motion hearing at which the argument was made — is before this Court on appeal, we hold that the argument is preserved for purposes of this appeal.

be admissible, in each individual trial, to prove the perpetrator's identity. Traish, 36 Va. App. at 130, 549 S.E.2d at 13; see also Commonwealth v. Minor, 267 Va. 166, 174, 591 S.E.2d 61, 66-67 (2004); Turner v. Commonwealth, 259 Va. 645, 651, 529 S.E.2d 787, 791 (2000) ("Proof of *modus operandi* is competent evidence where there is a disputed issue of identity.").

In this case, the trial court specifically found that, "for all of the reasons we've talked about . . . [and] in weighing all of the competing interests in this type of circumstance, [] justice suggests it is appropriate to try these cases together." The trial court reasoned that,

> in balancing all of the . . . possible prejudice to the defendant, including the fact that several lay witnesses perhaps ostensibly might be required to testify in multiple separate trials if they were to be held separately, the standard by which that evidence is judged, and the likelihood that at least some of those individuals may be in a position to be permitted to offer testimony as to identity in those cases in which identity would be an issue,

joining the cases together would not prejudice Scott. We agree.

Because the crimes were strikingly similar, evidence from one crime would be highly relevant in the trial of another in order to establish the identity of the perpetrator. See Shifflett, 29 Va. App. at 529, 513 S.E.2d at 444. Specifically, as discussed above, each crime was committed during the late evening, each victim was alone outside of his or her Virginia Beach residence, each perpetrator used a handgun, each perpetrator threatened violence or actually struck the victim, each perpetrator demanded money and credit cards from the victim, each perpetrator fled on foot, and, during most of the crimes, the perpetrator also requested a PIN number. Considering these factual similarities, "proof of the identical methods used to commit the [] robberies tends to prove the identity of appellant as the person who committed [each] offense[]." Yellardy, 38 Va. App. at 25, 561 S.E.2d at 742; see also Ferrell, 11 Va. App. at 389-90, 399 S.E.2d at 619 (upholding joinder of offenses for trial under Rule 3A:6(b) and noting that the charged offenses "need not bear . . . an exact resemblance" to one another, but must

- 12 -

instead "bear a singular strong resemblance . . ., thus tending to establish the probability of a common perpetrator" (internal quotations omitted)).

Although relevant to prove identity, however, we must also consider whether the probative value of the other offenses would be outweighed by the potential for unfair prejudice. See Guill, 255 Va. at 139, 495 S.E.2d at 491-92 ("Admission of [other crimes] evidence . . . is subject to the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice caused the defendant."); Lewis v. Commonwealth, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983) ("Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if otherwise competent, is admissible."). If so, justice would likely require separate trials because the evidence, although factually relevant, would be inadmissible during the individual trials of the separate offenses. See Commonwealth v. Long, 20 Va. App. 223, 226, 456 S.E.2d 138, 139 (1995) ("Justice often requires separate trials where highly prejudicial evidence of one of the crimes is not admissible in the trial of the other.").

In each of the instant cases, "[a]t trial, the identity of the perpetrator was the primary issue in dispute." Traish, 36 Va. App. at 130, 549 S.E.2d at 13. Because, under these circumstances, "the probative value of the evidence of the other offenses is obvious, we cannot say that [the] trial court abuse[d] its discretion by finding that the probative value outweigh[s] the prejudicial effect of such evidence." Id. at 131, 549 S.E.2d at 13; see also Brown, 37 Va. App. at 516, 559 S.E.2d at 420. Because proof of the other crimes would therefore be admissible during each individual trial as proof of the perpetrator's identity, it follows that the trial court did not abuse its discretion in determining that justice permitted these offenses to be tried simultaneously. See Traish, 36 Va. App. at 131, 549 S.E.2d at 13; see also Yellardy, 38 Va. App. at 26, 561 S.E.2d at 743 ("Because proof of the two offenses was relevant to prove . . .

- 13 -

identity, . . . justice did not require separate trials."). And, because justice did not require separate trials, the separate offenses met the requirements of Rule 3A:10(c) and, thus, could be tried together in a single proceeding.

CONCLUSION

Because of the strikingly similar characteristics of the nine robberies, a fact finder could reasonably infer that they constituted parts of a common scheme, as required by Rule 3A:6(b). And, because evidence of the other crimes would have been admissible in each of the individual trials to establish the identity of the perpetrator, the trial court did not abuse its discretion in concluding that justice allowed the offenses to be tried together. Because the requirements of Rule 3A:10(c) were therefore fulfilled, it follows that the trial court did not abuse its discretion by granting the Commonwealth's motion for joinder. Thus, we affirm Scott's convictions.

Affirmed.

Benton, J., dissenting.

I dissent from the majority opinion because I believe that the circuit judge did not have the discretion to join the offenses for a single trial. I also believe that in reviewing this appeal, we are limited to considering the prosecutor's pretrial proffer made to the circuit judge in support of the motion for joinder and, thus, we cannot consider the evidence later introduced at trial in determining the propriety of the pretrial decision to join the offenses for trial. Even so, neither the proffer nor the evidence established a sufficient basis to find a common scheme or plan underlying the charges. The circuit judge's error was prejudicial to Otis Scott, and it requires the granting of new, separate trials.

When arguing the motion for joinder, the prosecutor proffered the following:

> The first victim—alleged victim is Michelle Bingham . . . . The second victim . . . . It's Florentina Lizan. That's March 16th of 2003. The third victim is Kay Holloway. That is March 23rd of 2003. The fourth victim is Jeff Ratliff, 4-27-2003. The fifth victim is Holly Narducci, and that's May 2nd of 2003. The sixth victim is Aderonte Aderonmu, which is May 15th of 2003. The seventh alleged victim is Samuel Owens on May 31, 2003. The eighth victim is Jean Becker on May 31, 2003; and the ninth victim is Ian Goodwin; and that is June 7, 2003.
>
> . . . [T]he similarities between these nine separate victims are this: The times of the offense for each of those occurred between 10:00 p.m. and 12:30 a.m.
>
> In each [of the] separate nine incidents, the victim was alone. In each . . . the attacker was alone as he approached the victim.
>
> In eight of the nine separate incidents, each victim alleged— stated that a gun was allegedly used. The ninth victim, Jean Becker, stated that a hard metal object was used. She could not see if it was a gun or not.
>
> In eight of the nine separate incidents, each victim was approached as they approached their residence[s]. . . . The first incident, Michelle Bingaman—she had just parked at a spot in front of her residence after driving up. The second victim, Miss Lizan, was outside her front door after exiting her vehicle. The third victim, Kay Holloway, was outside her house while getting

- 15 -

out of her car. Mr. Ratliff was in the driveway of a residence. Holly Narduci was inside her garage of her residence. Miss Aderonmu was in the street in front of her residence just after parking her vehicle. Samuel Owens was inside . . . a garage at a residence. Miss Becker was entering her garage while exiting her car as she had just pulled up, and Ian Goodwin was in the driveway of a residence—was in the driver's seat of a vehicle with the door open.

In eight of the nine incidents, personal property was demanded. In six—seven of the incidents either there was bodily injury threatened or there was actually bodily injury. . . . In all nine of them allegedly personal property was taken. In five of the incidents the assailant asked the victims for their PIN numbers to their credit cards and/or ATM cards. In each of the incidents, they were all adult victims. In each of the incidents, they were all adult suspects. In each of the incidents it was an African-American; and, again, in each it was a male.

This proffered version of the facts was all that the circuit judge had available to consider when deciding the prosecutor's pretrial joinder motion and, thus, this proffer is all that we should consider when determining whether the judge erred in making that decision. See Spence v. Commonwealth, 12 Va. App. 1040, 1045, 407 S.E.2d 916, 918-19 (1991) (explaining that in determining whether to sever charges, the circuit judge "should make the determination based upon the situation as it appears before trial").

In support of the joinder motion, the prosecutor argued that the proffered facts indicated the common plan or scheme was as follows:

The scheme was to rob people as they were going into their residence - - either getting out of their vehicle in their driveway or entering the residence late at night in a residential area when they were alone and with a gun and demanding property and threatening bodily harm or committing bodily harm in most of the cases; and so, yes, I think that's a common scheme tying all these cases together - - and in each one approaching on foot. That is distinctive as well, and then seen fleeing in a vehicle - - approaching on foot and then seen fleeing in a vehicle.

- 16 -

In response, Scott's attorney argued that those circumstances were irrelevant to the issue of joinder and pertained only to "whether the evidence would be admissible in a single trial to prove identity."

The circuit judge applied a "balancing" test and granted the prosecutor's motion. He ruled as follows:

> In weighing all of the various factors that we have considered during our discussions today on this motion, and in balancing all of the prejudice or the possible prejudice to the defendant and the other factors that we've talked about, including the fact that several lay witnesses perhaps ostensibly might be required to testify in multiple separate trials if they were to be held separately, the standard by which that evidence is judged, the likelihood that at least some of those individuals may be in a position to be permitted to offer testimony as to identity in those cases in which identity would be an issue, the substantial similarities in terms of the modus operandi in these offenses, the method by which they were carried out, the similarity in the selection of the victims, the type of victim, the location that was selected for the offenses, the offense itself that was committed, what was taken, what was requested in addition to the method and means by which the crimes were carried out, I think all of that suggest that the Commonwealth's motion should be granted.

The judge's decision was plainly wrong.

The governing principles are straight-forward. The circuit judge "has limited discretion to order an accused to be tried for more than one offense at the same time." Godwin v. Commonwealth, 6 Va. App. 118, 121, 367 S.E.2d 520, 521 (1988). The judge's discretion is prescribed in Rule 3A:10(c): "The court may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto." By its plain terms, Rule 3A:6(b) provides for the joinder of offenses in the absence of consent only where the offenses are "based on" (1) "the same act or transaction,"

- 17 -

(2) "two or more acts or transactions that are connected," or (3) "two or more acts or transactions that . . . constitute parts of a common scheme or plan."

As the majority notes, the Commonwealth argues only that the circuit judge could have reasonably inferred "that the acts constituted parts of a common scheme or plan." I disagree with the majority's conclusion that the charged crimes "were related by virtue of a common scheme."

We have been clear about the required standard in these cases.

> A common scheme or plan is present only if the "relationship among offenses . . . depend[s] upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not obtainable by the commission of any of the individual offenses."

Spence, 12 Va. App. at 1044, 407 S.E.2d at 918 (quoting Godwin, 6 Va. App. at 122, 367 S.E.2d at 522); see also Yellardy v. Commonwealth, 38 Va. App. 19, 25, 561 S.E.2d 739, 742 (2002) (applying Spence's definition of a common scheme or plan). In a similar vein, the Supreme Court has held that similar acts may tend to show a common scheme or plan only "where there is 'such a concurrence of common features that the various acts are *naturally to be explained as caused by a general plan of which they are the individual manifestations*.'" Scates v. Commonwealth, 262 Va. 757, 762, 553 S.E.2d 756, 759 (2001) (emphasis added, citation omitted). These cases recognize a distinction between mere similarity of crimes and a "common scheme or plan." Separate crimes of the same type do not automatically translate to crimes of a common scheme or plan. See Boyd v. Commonwealth, 213 Va. 52, 53, 189 S.E.2d 359, 360 (1972) (reversing a conviction because the three heroin sales were not part of a general scheme); Spence, 12 Va. App. at 1044, 407 S.E.2d at 918 (holding that no evidence of the four drug sale charges tied the sales together); see also Scates, 262 Va. at 760-62, 553 S.E.2d at 758-59 (reversing the conviction because the defendant's admission that he "jammed" credit cards into

- 18 -

doors in order to enter other homes was not admissible as demonstrative of a common "scheme of breaking into homes").

The nine robberies charged against Scott occurred over the span of four months. Fitting with the definition of robbery, the nine acts involved violence or the threat of violence. Although each victim was alone in a residential neighborhood in the City of Virginia Beach (the most populous city in Virginia and one of the largest cities in land area in the continental United States), this fact establishes no relationship among the offenses that is relevant to a common scheme or plan. While it is true that on each occasion the robber demanded personal property, this is the hallmark of an ordinary robbery. Despite sharing some similarities, the robberies were not shown to have a relationship indicative of a common plan or scheme. Neither the Commonwealth's proffer nor the full record revealed "a plan that ties the offenses together . . . [or] demonstrates that the objective of each offense was to contribute to the achievement of a goal not obtainable by the commission of any of the individual offenses." Godwin, 6 Va. App. at 122, 369 S.E.2d at 5.

Rule 3A:10(c) requires more than proof of propensity to commit crime. Spence, 12 Va. App. at 1045, 407 S.E.2d at 918. Merely to posit that the robberies had striking similarities is insufficient to show that the separate crimes grew from a common scheme or even were related. Indeed, one robbery is not connected to another merely because they occurred in a residential area; robberies are not limited to commercial districts. Muggings are not uncommon occurrences and often involve threats of violence and guns. Likewise, it is not unusual for a robber to demand money or credit cards. The fact that a lone robber chose a lone victim is hardly surprising. Possibly the only peculiar fact about some of these robberies is that the robber demanded personal identification numbers for the stolen cards, but, because it is common knowledge that such a number is necessary to withdraw cash from an automated machine or

using a credit card, this fact does not adequately connect even those five robberies. These proffered facts established no "general plan" or acts that were "naturally . . . the individual manifestations" of a general plan or scheme. Scates, 262 Va. at 762, 553 S.E.2d at 759. Simply put, "[t]here is no evidence of a plan tying [the offenses] together or showing that each offense was intended to assist in accomplishing a goal other than that achieved by each individual offense." Spence, 12 Va. App. at 1044-45, 407 S.E.2d at 918.

In addition, the judge's ruling that the similarities of the crimes was a sufficient basis to grant the joinder motion invoked an erroneous legal standard and, therefore, was an abuse of discretion. An abuse of discretion is "an adjudicator's failure to exercise sound, reasonable, and legal decision-making." Black's Law Dictionary 11 (8th ed. 2004). Thus, a judge errs, "as a matter of law" when the judge "use[s] an improper legal standard in exercising [a] discretionary function." Thomas v. Commonwealth, 263 Va. 216, 233, 559 S.E.2d 652, 661 (2002); see also Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998) (holding that a trial judge by definition abuses his discretion when the judge makes an error of law). Here, the circuit judge indicated he was swayed by the inconvenience of requiring witnesses "to testify in multiple separate trials" and "the similarities in terms of the modus operandi of these offenses." The judge's consideration of these factors of convenience and identity caused the judge to misapply the law in granting the Commonwealth's motion. The provisions of Rule 3A:10 and Rule 3A:6 do not pertain to the convenience of witnesses. Moreover, the circuit judge relied on the similarities between the crimes but did not explicitly find the existence of circumstances indicative of a common plan or scheme. While it is possible the judge concluded "that, since the offenses were factually similar, they were committed by the same person[] as part of a plan," such a conclusion "is speculative." Godwin, 6 Va. App. at 123, 367 S.E.2d at 522. By

- 20 -

definition, this error was an abuse of his discretion. See Shooltz, 27 Va. App. at 271, 498 S.E.2d at 437.

Furthermore, I do not believe that the evidence of the other crimes would have been admissible to prove identity even if the charges had been tried separately.

> "The general rule is well established that in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times . . . is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged."

Donahue v. Commonwealth, 225 Va. 145, 155, 300 S.E.2d 768, 773 (1983) (quoting Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970)). This rule exists because "'evidence implicating an accused in other crimes . . . may confuse the issues being tried and cause undue prejudice to the defendant.'" Minor v. Commonwealth, 267 Va. 166, 172, 591 S.E.2d 61, 65 (2004) (quoting Guill v. Commonwealth, 255 Va. 134, 138, 495 S.E.2d 489, 491 (1998)). Indeed, as we noted in Spence, "[t]he introduction of evidence of factually similar offenses, even those occurring within hours of one another, has been held to be error." 12 Va. App. at 1042, 407 S.E.2d at 917 (citing Boyd, 213 Va. 52, 189 S.E.2d 359); see also Godwin, 6 Va. App. at 124-25, 367 S.E.2d at 523 (holding that "without the showing of an unusual or distinctive *modus operandi*, evidence of one of the robberies would not have been admissible in the trial of the other"); Henderson v. Commonwealth, 5 Va. App. 125, 360 S.E.2d 876 (1987) (reversing the conviction because the evidence of the other robberies was inadmissible to prove identity); Johnson v. Commonwealth, 3 Va. App. 444, 350 S.E.2d 673 (1986) (holding that evidence of the defendant's previous burglary conviction was not allowed to prove identity for the current burglary charge despite the use of the same lock-picking tool).

Proof of other crimes may be admissible in order to prove identity if the crimes share the same modus operandi. Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 616 (1990).

However, "without a showing of an unusual or distinctive *modus operandi*, evidence of one . . . [robbery is] not . . . admissible in the trial of . . . [an]other." Godwin, 6 Va. App. at 124-25, 367 S.E.2d at 523. A modus operandi exists where "the other crimes bear 'a singular strong resemblance to the pattern of the offense charged.'" Spencer, 240 Va. at 90, 393 S.E.2d at 616 (quoting United States v. Hudson, 884 F.2d 1016, 1021 (7th Cir. 1989)).

The robberies at issue do not "bear a singular strong resemblance" to each other and thus do not share a modus operandi. As in Godwin, "although factually similar, [the offenses] were not so unusual or distinctive as to identify the person who committed . . . them." 6 Va. App. at 125, 367 S.E.2d at 523. Proof of the nine offenses in a single trial merely tended to improperly show that Scott "has the propensity to commit the crime[,] and this inference has been held to be error because it reverses his presumption of innocence." Spence, 12 Va. App. at 1045, 407 S.E.2d at 918 (reversing a conviction because the trial judge refused to sever four charges for distribution of cocaine).

For these reasons, I would hold that the trial judge abused his discretion in granting the motion to join the offenses for trial. I would reverse the convictions and remand for new, separate trials.